IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>   v.<br><br>JERMAINE COLEMAN | CRIMINAL ACTION<br>NO. 15-543 |

**PAPPERT, J.**                                                                                                                            December 23, 2022

## **MEMORANDUM**

      Jermaine Coleman is on supervised release after serving a term of incarceration for a spate of bank robberies where he terrorized the tellers and threatened their lives. He has violated his release conditions numerous times, most recently by removing his GPS location monitoring bracelet while on home confinement. Coleman first told his probation officer he hadn't deliberately taken the bracelet off his leg, but that it came undone when he drunkenly slipped coming out of the bathtub. A few days later he admitted to the probation officer that he lied and said the device really came off when his drunken girlfriend grabbed it while they were fighting in bed.

      The Probation Office sought to modify Coleman's release conditions to place him in a Residential Reentry Center for 120 days. The Court held a hearing at which the probation officer and his colleague, a location monitoring specialist, explained how the ankle bracelet could not have come off Coleman's leg in the manner he claims. The Court also examined the torn rubber bracelet, concluded that Coleman's second story was as patently absurd as the first, and granted the Probation Office's Modification Petition.

      Coleman has now appealed the Court's decision (ECF 113) and moved to stay it (ECF 115) pending that appeal. He doesn't contest the Court's finding; he complains

that the Court didn't explain how its decision related to the factors under 18 U.S.C. § 3553(a). The Court denies the motion because there is a viable basis in the record for the modification.

I

A

Coleman has a long and violent criminal history, beginning with numerous juvenile adjudications for, among other things, receiving stolen property and retail theft. (Expedited Presentence Investigation Report ("PSR") ¶¶ 50–56.) Prior to his convictions in this case, Coleman had four adult criminal convictions for a variety of offenses including a robbery where he abducted the victim at gunpoint, stole his car and led Philadelphia police on a high-speed chase, endangering pedestrians and colliding with police cars along the way. (*Id.* at ¶ 58.) One month later, working with others, Coleman forced three victims to the basement of a residence at gunpoint, tied them to chairs and demanded money under threat of violence. (*Id.* at ¶ 59.) Two of the victims were severely beaten while tied to the chairs; the other was shot when he tried to escape. (*Id.*) Coleman himself later escaped from a community corrections facility and remained on the lam until he was arrested and subsequently convicted in a separate matter on forgery and related charges. (*Id.* at ¶¶ 59–60.)

In this case, Coleman robbed three banks over the course of five days in March of 2013. (Guilty Plea Agreement ¶ 1, ECF 49). Each time, Coleman handed the tellers notes stating, in various ways, he would kill them if they did not comply with his orders, that they would "be the first to DIE!" or that "you will see your last face on this earth will be mine [sic]." (PSR at ¶¶ 11–13.) When one teller panicked and screamed,

he told everyone to "shut the fuck up" and threatened to "blow their heads off." (*Id.* at ¶ 11.) While on this violent crime spree, Coleman was on parole from his convictions in the prior gunpoint robberies. (*Id.* at ¶ 62.)

Coleman was indicted by a federal grand jury on three counts of bank robbery in violation of 18 U.S.C. § 2113(a). (ECF 1.) He pleaded guilty to all three counts in December of 2017 and Judge DuBois sentenced him to 78 months of imprisonment, followed by three years of supervised release. (J. Criminal Case, ECF 59). Between his arrest and sentencing, Coleman committed five disciplinary infractions while in federal custody. (PSR at ¶ 10.)

B

Coleman was released from prison and commenced his supervised release on July 23, 2020. Thirteen months later, he filed a motion for early termination of his supervised release and shortly thereafter his case was reassigned to this Court upon Judge DuBois's retirement. (ECF 97, 99.) The Court subsequently denied Coleman's motion because his extensive criminal history warranted continued supervision. (ECF 102, 103.)

A few months after the Court's decision, Coleman's conduct under supervision began to deteriorate. In January of 2022, he tested positive for marijuana and in April received a traffic citation for speeding in Maryland, despite not receiving permission to travel there. (May 10, 2022 Req. Modify p. 1, ECF 104.) The Probation Office filed a petition to modify the conditions of supervised release to require Coleman to perform twenty-five hours of community service. (*Id.*) In May, Coleman agreed to the proposed modification and the Court approved it. (*Id.* at p. 2.)

The following month, Coleman admitted to several more violations, namely again traveling out of state multiple times (to New York, New Jersey and Virginia) without permission, being cited for, and failing to report to Probation, a traffic violation with marijuana in his car and testing positive for marijuana while acknowledging he was "consistently" smoking the stuff. (June 30, 2022 Req. Modify p. 2, ECF 105.) Based on these violations, the Probation Office sought to again modify Coleman's conditions of supervision to place him on home confinement for 120 days and to comply with all requirements of the Office's Location Monitoring Program. (*Id.* at p. 1.) Again, Coleman agreed to the modification and the Court approved it on June 30, 2022. (*Id.* at p. 3)

Unfortunately, home confinement also failed to deter Coleman's violative conduct. He again tested positive for marijuana on July 28, though the Probation Office took no action at that time. (Dec. 2, 2022 Req. Modify pp. 2–3, ECF 106.) On October 27, however, Probation received a "tamper alert" from Coleman's electronic monitoring transmitter, or ankle bracelet. (*Id.*) His probation officer, Kenneth Bergmann, went to Coleman's house at approximately 10:00 p.m. and found that the bracelet "was no longer affixed to Coleman's leg." (*Id.*) For his part, Coleman claimed he slipped while stepping out of the bathtub drunk, causing the bracelet to "rip off his leg." (*Id.*) During a meeting with Officer Bergmann four days later, Coleman admitted the obvious—that he had lied about what happened and proceeded to tell another tall tale. (*Id.* at p. 4.) Despite having four days to come up with a better story, Coleman now said he and his girlfriend, both of whom had been drinking, were in bed arguing and the girlfriend grabbed the bracelet "causing it to rip off his leg." (*Id.*)

All of this, combined with another urine test allegedly positive for marijuana, caused the Probation Office to again seek modification to Coleman's supervised release conditions, this time placement in an RRC for 120 days. (*Id.* at p. 3.)

C

Coleman requested a hearing on these allegations, which the Court held on December 8, 2022. (ECF 108, 112.) Coleman moved before the hearing to represent himself and, after a lengthy colloquy and having Jerome Brown (for whom Coleman works as a paralegal) serve as standby counsel, the Court allowed him to do so. (Hr'g Tr. pp. 3–23, ECF 117.)

Senior United States Probation Officer Bergmann, who submitted the modification petition, testified first. He spoke initially to the drug tests, but after cross-examination and considering all of the testimony, the Court concluded (notwithstanding Coleman's previous admission that he "consistently" smokes pot) the Government did not prove, by a preponderance of the evidence, that Coleman did so on the dates in question. (Hr'g Tr. pp. 28, 41–53, 78.) The removal of the bracelet, however, was another matter. Bergmann testified to the importance of the ankle bracelet in making sure Coleman complied with the conditions of his home confinement, his notice of the tamper alert and the actions he took after receiving that notice, notably his telephone call to Coleman followed by his visit to Coleman's residence, when Coleman told the first lie, the drunken bathtub missive. (*Id.* at pp. 28–33.) Bergmann added that, in his twenty years of experience as a probation officer, he never heard of an ankle bracelet being removed in either of the ways Coleman claimed it happened. (*Id.* at 33:10–15.) More specifically, in response to Coleman's questions,

Bergmann said the bracelet was "purposely, not accidentally removed." (*Id*. at 41:7–17.)

The Court also heard from Senior United States Probation Officer John Lackey, a Location Monitoring Specialist with extensive experience in location monitoring technology. (*Id*. at 54:9–19.) Officer Lackey examined the GPS tracking bracelet that Coleman had been wearing and, based on his experience, described how the bracelets can be removed and how difficult removing such a device can be. (*Id*. at 55:13–57:3.) He then described the bracelet's composition and concluded that it did not come off Coleman's leg by accident, but that its removal was by a "deliberate action." (*Id*. at 57:4–13.) And in any event, according to Lackey, if someone had merely pulled the bracelet apart, it would have become disengaged at a specific connection point without having the rubber, as it was in Coleman's case, torn in two. (*Id*. at 57:14–58:2.) The Court then examined the bracelet and, in response to the Court's question, Lackey said Coleman's girlfriend could not have pulled the bracelet off. (*Id*. at 67:2–68:6.)

D

The Court fully credited Officers Bergmann and Lackey's testimony pertaining to the ankle bracelet and its removal. Their testimony alone was more than sufficient to prove that Coleman, with or without the assistance of others, tampered with and forcibly removed his ankle bracelet, violating the terms and conditions of his home confinement. But as the Court told Coleman directly, all the Court had to do was examine for itself the thick rubber bracelet (with a wire running through it) and see that it had been jaggedly ripped apart, something that could not have been an accident

6

or done when his girlfriend grabbed it as the two of them drunkenly tussled in bed.[1] Moreover, Coleman admitted his bathtub anecdote was a lie, and his second fable was equally laughable. The Court had all the grounds it needed to grant the Petition. (*Id*. at 78:18–80:16.)

## II

Coleman appealed the Court's decision (ECF 114) and then moved to stay it. (ECF 115.) Coleman grounds his motion in Fed. R. App. P. 8(a)(1)(A), but in a criminal case, a stay pending appeal is properly governed by Rule 38 of the Federal Rules of Criminal Procedure. *See* Fed. R. App. P. 8(c). Although Rule 38 does not explicitly reference supervised release orders, the Third Circuit, without ruling, considered the stay of such orders "possible" pending an appeal, and other circuits have expressly allowed it, noting the District Court's inherent authority to grant stays. *See United States v. Sczubelek*, 402 F.3d 175, 180 (3d Cir. 2005); *United States v. Smart,* 406 F. App'x 14, 18–19 (6th Cir. 2010) (citing *Nken v. Holder*, 556 U.S. 418, 421 (2009)).

In his motion, Coleman does not, nor could he, contest the Court's finding that he violated the conditions of his supervised release by deliberately removing his ankle bracelet. The basis for his motion is that the Court "did not consider whether the 18 U.S.C. § 3553(a) factors supported the particular modifications nor explain and justify"

---

[1] At the hearing, Coleman sought a continuance based on advice from his standby counsel so he could "explore the possibility" of having an "expert in the matter of rubber" who would potentially contradict Bergmann and Lackey's (and the Court's own) view that the bracelet could not have come off in the manner he claims. (*Id*. at 77:3–11.) Coleman complains about the Court's denial of his request for a continuance in his motion. (ECF 115, p. 12.) There was no basis for a continuance for that or any of Coleman's proffered reasons. His request for additional urine testing was moot after the Court found in his favor on the drug test and no "rubber expert" could have enlightened the court on whether or not the ankle bracelet was torn apart by force. *Res Ipsa Loquitur*.

how placement in the RRC was related to the factors or his integration into society. (Mot. § II.)

### III

Four factors govern whether a stay should be granted pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States v. Safehouse*, 468 F. Supp. 3d 687, 690 (E.D. Pa. 2020).[2] In balancing these factors, the first and second are the "most critical," and the party requesting a stay bears the burden to show the circumstances justify an exercise of the Court's discretion. *Id.* at 691 (quoting *Nken v. Holder*, 566 U.S. 418, 433–434 (1987)).

Because the first two factors are the most critical, if the chance of success on the merits is only "better than negligible" and the "possibility of irreparable injury" is low, a stay movant's request fails. *Id.* at 570. A movant is required to show, at a minimum, "serious questions going to the merits." *Id.*

### IV

#### A

Success on the merits is "arguably the most important" factor and requires the movant demonstrate he has a "reasonable chance, or probability, of winning." *In Re*

---

[2] Coleman directs the Court to apply the substantial factor test outlined in *United States v. Smith*. 793 F.2d 85, 86 (3d Cir. 1986); (Mot § III). *Smith* concerns a convicted defendant's release on bail pending an appeal of his conviction. *See id.* (citing 18 U.S.C. § 3143(b)). Because Coleman filed a motion for stay, not bail, and because Coleman is not imprisoned as § 3143(b) contemplates, the Court instead evaluates his motion under the stay factors reiterated in *Nken v. Holder* and suggested by the Government. 566 U.S. 418, 433–434 (2009); (Gov't Response pp. 1–2, ECF 116).

*Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). While this probability need not be more likely than not, it must be "significantly better than negligible." *Id.* at 571.

Coleman cannot show he has a "reasonable chance" of winning because the record provides a viable basis for the Court's ruling. His argument is procedural; that the Court did not expressly discuss how his placement related to the 18 U.S.C. § 3553(a) factors, or how the modified condition was "sufficient, but not greater than necessary." (Mot. § II, IV.)

Under 18 U.S.C. § 3583(e)(2), a Court may, after considering the factors set forth in 18 U.S.C. § 3553(a), modify, reduce or enlarge the conditions of supervised release. *United States v. Murray*, 692 F.3d 273, 278 (3d Cir. 2012). These factors enlighten whether the modifications imposed were appropriate and involve "no greater deprivation of liberty than is reasonably necessary…." *Id.* at 280. When a district court does not make clear why it imposed a particular release condition, an appellate court can affirm the condition if there is "any viable basis…for the restriction in the record…." *Id.* at 281 (citing *United States v. Miller,* 594 F.3d 172, 183 (3d Cir. 2010)). The record here supplies ample bases for why placing Coleman in the RRC for 120 days was appropriate and no greater than necessary.

B

Coleman's offenses, and his history and characteristics, particularly for breaking the law and violating the conditions of his supervised release, were all out in the open. He doesn't challenge the Court's finding. The Probation Office had been relatively patient with Coleman and imposed modest and progressively enhanced sanctions for his repeated violations. For using drugs and traveling out of state without permission,

9

Coleman was required to perform only twenty-five hours of community service. When that didn't correct his behavior and the following month he travelled to three different states, all again without permission, failed to tell Officer Bergmann he was cited for a traffic violation with marijuana in his car and admitted to "consistently" smoking pot (with each toke a separate violation), he was placed on home confinement with location monitoring for 120 days. And when he ripped his ankle bracelet off and twice lied about how it happened, Officer Bergmann sought placement in the RRC for another 120-day period. In fact, even though Coleman violated his release conditions in succession, multiple times and in multiple ways, Officer Bergmann sought only the modification for RRC placement and not a revocation of supervised release because he thought a revocation wasn't warranted given positive things Coleman had done in the community. (Hr'g Tr. 33:19–34:3.)

The record shows placement in the RRC was an appropriate and reasonable effort to deter Coleman from continuing to violate his release conditions and not a greater deprivation of his liberty than reasonably necessary for purposes of the § 3553(a) factors. 120 days of home confinement hadn't deterred Coleman or gotten him to comply with supervised release. The RRC was the next, reasonable step in the Probation Office's, and the Court's, incremental approach to Coleman's repeated transgressions, whether or not the Court found Coleman had, yet again, used drugs. Ripping off the GPS tracker and repeatedly lying about it isn't nothing, and depriving Coleman of the comforts of home was not unreasonable or disproportionate, something apparent from the record.

Coleman's only argument pertaining to the second factor, potential for irreparable injury, is that placement in the RRC would "materially undermine his right to self-representation." (Mot § V.)  Coleman argues that, should his stay be denied, his ability to "present the Appellate Court with briefing on the issues he intends to raise" will be hindered by his "limited access to legal materials" in the RRC. (Mot. § I.)  Coleman's choice to represent himself while appealing his conditions of supervised release cannot, on its own, serve as the basis for staying those same conditions of supervised release.

Coleman must "demonstrate that irreparable injury is likely" in the absence of a stay, not "merely possible." *In Re Revel AC, Inc.*, 802 F.3d at 569.  "Likely," in this context, means "more apt to occur than not." *Id*.  Coleman does not say what resources he would lack in the RRC, nor does he allege with any specificity how his appellate advocacy would be hampered.  Coleman has not shown his placement in the RRC is more likely than not to irreparably injure him.  While he may not have as convenient access to legal materials as he could in his home, that alone does not "materially undermine" his right to self-representation.  *See* (Mot. § V).

The third factor, potential harm to the non-moving party, is weighed against the harm found in factor two.  *In Re Revel AC, Inc.*, 802 F.3d at 569.  The final factor concerns the public interest.  *Id*.  Besides a blanket statement that a stay would "not harm the government or the public interest," Coleman doesn't address either factor in substance.  Officers Bergmann and Lackey testified about the need to modify Coleman's supervised release.  His violation of the home confinement condition necessitated his placement in an RRC.  While the Court does not find irreparable harm to the

Government "likely" in the event of a stay, the potential for such harm would outweigh Coleman's potential inconveniences. For the same reasons as factor three, and absent any argument from Coleman in the alternative, the public interest favors denial.

V

Under the "sliding-scale" balancing approach applied to these factors, the "less likely a movant is to win, the more the other factors must be in his favor" to prevail. *In Re Revel AC, Inc.*, 802 F.3d at 569. "Even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to [stay opponent] if a stay is granted, [he] is still required to show, at a minimum, 'serious questions going to the merits.'" *Id*. (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153–54 (3d Cir. 1991)). Coleman has not done so. He hasn't shown a "serious question going to the merits," "irreparable harm" should the stay be denied, or that public interest favors denial. *Id*. The record provides a viable basis for the Court's decision: Coleman's criminal history and characteristics, his demonstrated need for additional deterrence, and his failure to comply with previously imposed conditions of supervised release warranted a measured modification, one he received after an evidentiary hearing and in light of necessary considerations.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.